IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| FREE AND FAIR ELECTION FUND, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 16-04332-CV-C-ODS |
| | ) | |
| MISSOURI ETHICS COMMISSION, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| MISSOURI ELECTRIC COOPERATIVES, | ) | |
| d/b/a Association of Missouri Electric | ) | |
| Cooperatives, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| STATE OF MISSOURI, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER AND OPINION (1) GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTIONS TO DISMISS, AND (2) PARTIALLY GRANTING
PLAINTIFFS' MOTIONS FOR PERMANENT INJUNCTION**

On November 8, 2016, seventy percent of Missouri voters approved Initiative

Petition 2016-007, thereby amending, effective December 8, 2016, Article VIII of the

Missouri Constitution to add Section 23.[1]  Plaintiffs seek permanent injunctive relief

---

[1] The official ballot title provided:
>    Shall the Missouri Constitution be amended to:
>    • establish limits on campaign contributions by individuals or entities to
>    political parties, political committees, or committees to elect candidates for
>    state or judicial office;
>    • prohibit individuals and entities from intentionally concealing the source
>    of such contributions;
>    • require corporations or labor organizations to meet certain requirements
>    in order to make such contributions; and

preventing enforcement of several provisions of Section 23. Defendants seek dismissal of Plaintiffs' claims. As detailed below, the Court grants in part and denies in part Defendants' motions to dismiss, partially grants Plaintiffs' motions, and enjoins Defendants' enforcement of Section 23 in a manner inconsistent with this Order.

## I. BACKGROUND

Section 23 imposes campaign finance regulations and restrictions on individuals and entities in Missouri. Section 23's regulations and restrictions can be divided into three types: (1) monetary limits on contributions, (2) restrictions on the sources of some contributions, and (3) measures to prevent evasion of Section 23's regulations and restrictions.

Under Section 23's monetary limit on contributions, no individual may contribute more than $2,600 "[t]o elect an individual to the office of governor, lieutenant governor, secretary of state, state treasurer, state auditor, attorney general, office of state senator, office of state representative or any other state or judicial office...." Mo. Const., art. VIII, § 23.3(1)(a). A political party may not accept contributions, in aggregate, greater than $25,000 from an individual or political committee during any one election in which a political party participates. § 23.3(2)(a)-(b).

Section 23 imposes restrictions on contribution sources by dividing political candidates and committees into several overlapping categories, which are used to place restrictions on the sources from which these groups may receive contributions.[2] First, corporations and unions may not contribute to a campaign committee, candidate committee, exploratory committee, political party committee, or a political party, but may establish a "continuing committee" to which its members, officers, directors, employees, and security holders may contribute. § 23.3(3)(a). Second, corporations may only

---

> • provide a complaint process and penalties for any violations of this amendment?
> It is estimated this proposal will increase state government costs by at least $118,000 annually and have an unknown change in costs for local government entities. Any potential impact to revenues for state and local governments is unknown. Doc. #31, at 4 n.3.

[2] The law uses the term "committee" to include both an individual person and a combination of persons, based on the purpose of the individual or group. § 23.7(4).

contribute to a political action committee ("PAC") if the corporation is formed under chapters 347 through 360 of the Missouri Revised Statutes.[3]  § 23.3(12).   Third, a foreign corporation, one not organized under Missouri law, may not contribute to a PAC unless it is authorized to do business in Missouri pursuant to chapter 347.  § 23.3(16)(c).  Fourth, a PAC may not accept contributions from other PACs, candidate committees, political party committees, campaign committees, exploratory committees, or debt service committees.  § 23.3(12).  Fifth, candidate committees are prohibited from contributing to another candidate committee.  § 23.3(4).  Sixth, and finally, all candidates and committees are prohibited from receiving contributions from any out-of-state committee unless the out-of-state committee organizes within the State of Missouri or files Missouri-required disclosure reports.  § 23.3(11).[4]

Section 23 also includes measures to prevent evasion of the new regulations and restrictions.  Section 23 prohibits:  (1) any person from contributing under a fictitious or borrowed name (§ 23.3(7)); (2) any person from contributing anonymously in amounts greater than $25 (§ 23.3(8)); (3) any committee from receiving more than $500 in anonymous contributions (§ 23.3(9)), with a narrow exception for certain well-documented group events (§ 23.3(10)); and (4) any committee or political party from accepting a cash contribution over $100 per election (§ 23.3(6)).  Section 23 broadly forbids transferring "anything of value to any committee with the intent to conceal...the identity of the actual source."  § 23.3(14).  Further, Section 23 prohibits anyone from being reimbursed for contributions (§ 23.3(15)), and requires contributions from children under fourteen years old be deemed contributions from the child's parents or guardians (and thus, subject to their parents' or guardians' contribution limits).  § 23.3(17).

Defendant Missouri Ethics Commission ("MEC") is charged with enforcing Section 23.  Anyone who violates Section 23 may face civil and criminal penalties.  §§ 23.3(14), 23.4(1)–(6); 23.5; 23.6; *see also* Mo. Rev. Stat. §§ 105.955–.977 (2017).  Any person may file a complaint, and local county prosecutors may also bring charges for a

---

[3] All references to "chapter" are to chapters contained in the Missouri Revised Statutes unless stated otherwise.
[4] All non-Missouri committees remain free to make independent expenditures to influence Missouri elections in their own names.  *See generally* § 23 (providing no prohibition on such conduct).

violation of Section 23. Doc. #75. Finally, and relevant here, Section 23 includes a severability provision that provides, "[i]f any provision of this section is found by a court of competent jurisdiction to be unconstitutional or unconstitutionally enacted, the remaining provisions of this section shall be and remain valid." § 23.8.

Following Section 23's enactment, the MEC received questions from interested parties seeking to clarify what conduct Section 23 did or did not prohibit. On January 6, 2017, the MEC approved a resolution in which it acknowledged "interest of the regulated community in receiving interpretation" of many questions regarding Section 23, but the MEC declined "to issue the opinions on this date due to pending litigation but will consider the issuance on these questions on a future date." Doc. #35-1, at 6. On February 10, 2017, the MEC issued several advisory opinions interpreting provisions of Section 23. The Court will discuss applicable advisory opinions in detail below.

On December 7, 2016, Plaintiffs Association of Missouri Electric Cooperatives ("AMEC"), Association of Missouri Electric Cooperatives PAC ("AMEC-PAC"), David Klindt ("Klindt"), and Legends Bank (collectively "AMEC Plaintiffs") brought suit in the United States District Court for the Eastern District of Missouri against the State of Missouri, the MEC, and the MEC's Commissioners in their official capacities. Case No. 17-4006, Doc. #1.[5] AMEC is an association of nonprofit, member-owned rural electric cooperative corporations. AMEC's members are organized under chapter 394, related to rural electric cooperatives, rather than chapters 347 through 360. AMEC alleges Section 23 prevents it and their member organizations from contributing to AMEC-PAC and various other entities. Klindt is AMEC's Vice President.[6]

AMEC-PAC is a PAC formed and maintained by AMEC. AMEC-PAC alleges Section 23 unconstitutionally prohibits it from accepting contributions from its member organizations, both foreign and domestic. Legends Bank is a Missouri chartered bank organized under chapter 362. Legends Bank made contributions to PACs in the past, but alleges Section 23 now prohibits future contributions.

---

[5] AMEC Plaintiffs later filed an Amended Complaint. Case No. 17-4006, Doc. #28.
[6] Klindt recently retired from his position as AMEC Vice President, but is still associated with AMEC under a consulting agreement.

The MEC is a state agency acting under Missouri's executive branch. The MEC investigates and enforces Missouri's campaign finance laws, and is composed of six members appointed by the Governor with the Missouri Senate's advice and consent. Each member is a Missouri citizen and resident, and serves a four-year term. Currently, the commission members are Chair Nancy Hagan, and Vice Chairs Bill Deeken, Eric L. Dirks, Don Summers, Kim Benjamin, and George Ratermann.

AMEC Plaintiffs allege Section 23's prohibitions on contributions violate their First Amendment rights to free speech and assembly, their Fourteenth Amendment equal protection rights, and their rights under Article 1, Section 8 of the Missouri Constitution. AMEC Plaintiffs ask the Court to enjoin Defendants, their agents, or anyone acting on their behalf or in concert with them from enforcing Sections 23.3(12) and (16)(c).

On December 23, 2017, Plaintiffs Free and Fair Election Fund ("FFEF"), Missourians for Worker Freedom ("Worker Freedom"), American Democracy Alliance ("ADA"), John Elliott ("Elliott"), Herzog Services, Inc. ("HSI"), and Farmers State Bank ("Farmers") (collectively "FFEF Plaintiffs") brought suit in this Court against the MEC, its commissioners in their official capacities, and James Klahr in his official capacity as Executive Director of the MEC.[7] Case No. 16-4332, Doc. #1. FFEF is a Missouri PAC and continuing committee. FFEF's purpose is to receive monetary contributions and make independent expenditures to influence voters. Worker Freedom is a Missouri campaign committee. ADA is a Missouri not-for-profit corporation organized under chapter 355, with its principal place of business in Jackson County, Missouri. Elliott is a Missouri citizen and taxpayer. HSI is a for-profit corporation organized under Kansas law, but its principal place of business is in Missouri and it has authority to transact business in Missouri. Farmers is a Missouri chartered bank organized under chapter 362, and is a Missouri citizen and taxpayer, with its principal place of business in Missouri. Collectively, FFEF Plaintiffs challenge Section 23's $2,600 cap on

---

[7] Freedom PAC was initially a Plaintiff, but a stipulation of dismissal as to Freedom PAC (Doc. #42) was filed, after which the Court dismissed Freedom PAC from the lawsuit (Doc. #45).

contributions to candidates, and challenge the same source prohibitions challenged by AMEC Plaintiffs.[8]

Although AMEC Plaintiffs brought suit in the United States District Court for the Eastern District of Missouri, Judge Catherine Perry ordered the case transferred to the Central Division of this Court. Case No. 17-4006, Doc. #45. The Court then consolidated the AMEC matter with FFEF's challenge, and set a hearing on Plaintiffs' motions for preliminary injunction.[9] Doc. #25. Defendants filed two motions to dismiss, and the Court expedited the briefing so that all motions were fully briefed prior to the hearing. Docs. #28, 30, 32. Defendants' motions to dismiss were subsequently converted to motions for judgment on the pleadings.[10] Doc. #41. Finally, pursuant to Federal Rule of Civil Procedure 65(a)(2), the Court converted the hearing on Plaintiffs' motions for preliminary injunction to a hearing on Plaintiffs' requests for permanent injunction. Doc. #63.

On March 3, 2017, the Court held a hearing. All parties were expertly represented by counsel. During the hearing, the Court found several areas of agreement among the parties, and encouraged the parties to continue their dialogue regarding potential resolution of this matter. Although the parties were unable to resolve all claims, the parties reached agreement on two aspects. First, Defendants and the AMEC Plaintiffs stipulated to the dismissal of AMEC's Count V, which alleged Section 23's enactment violated the Missouri Constitution. Doc. #81. Accordingly, the Court dismissed Count V of AMEC's Amended Complaint. Doc. #87. Second, the parties agreed to a proposed consent judgment regarding the constitutionality and enforcement of Section 23's ban on corporate and union contributions to a ballot

---

[8] FFEF Plaintiffs alleged a violation of the United States Constitution's Privileges and Immunities clause, but have abandoned that claim. Doc. #60, at 35. Accordingly, the Court dismisses Count II of FFEF Plaintiffs' Complaint.

[9] On the same day the Court ordered these matters consolidated, the Court denied proposed Intervenor Todd Jones's Motion to Intervene. Case No. 17-4006, Doc. #54.

[10] Although the Court converted Defendants' motions to dismiss to motions for judgment on the pleadings, the Court refers to the motions as motions to dismiss for ease of reference. The Court reviews a motion for judgment on the pleadings under the same standard that governs motions to dismiss for failure to state a claim. *Ashley County, Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009); *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).

measure committee.  Doc. #79.  As detailed *infra*, section II.B.(3)(a), the Court incorporates this proposed consent judgment, and will enjoin enforcement of Section 23's ban on corporate and union contributions to a ballot measure committee.

## II.  DISCUSSION

The issues before the Court are numerous.  First, the Court considers Defendants' motions to dismiss.  Second, the Court considers Plaintiffs' motions for permanent injunctive relief.

## A.  Motions to Dismiss

Defendants filed two motions to dismiss.  First, Defendants move to dismiss the State of Missouri and all state-law claims presented in AMEC Plaintiffs' Amended Complaint.  Doc. #28.  Second, Defendants move to dismiss the operative complaints in both matters in their entirety.  Doc. #30.  The Court grants Defendants' first motion (Doc. #28), and denies Defendants' second motion (Doc. #30).

## (1) First Motion to Dismiss

Defendants seek to dismiss the State of Missouri and all state-law claims brought by AMEC Plaintiffs.  "The Eleventh Amendment immunizes an unconsenting State from damage actions brought in federal court, except when Congress has abrogated that immunity for a particular federal cause of action."  *Becker v. Univ. of Neb. at Omaha*, 191 F.3d 904, 908 (8th Cir. 1999); *see generally Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73 (2000) ("[F]or over a century now, we have made clear that the Constitution does not provide for federal jurisdiction over suits against nonconsenting States.").  Three exceptions to Eleventh Amendment immunity exist:  (1) where the state waives immunity by consenting to suit in federal court, (2) where Congress abrogates the state's immunity through valid exercise of its powers, and (3) under *Ex parte Young*, 209 U.S. 123 (1908), where the plaintiff files suit against state officials seeking prospective equitable relief for ongoing violations of federal law.  *Sundquist v. Neb.*, 122 F. Supp. 3d 876, 876 (D. Neb. 2015).

AMEC Plaintiffs argue the State of Missouri is not immune from suit for declaratory judgment actions under state law, and maintain the state waived immunity by appearing in this matter. The Court rejects these arguments. AMEC Plaintiffs point to case law in which actions seeking a declaration that Missouri laws are unconstitutional proceeded against the State of Missouri. *See, e.g.*, *Rizzo v. State*, 189 S.W.3d 576 (Mo. banc 2006); *Legends Bank v. State*, 361 S.W.3d 383 (Mo. banc 2012). However, AMEC Plaintiffs' Count V, the only count presenting a challenge solely under Missouri law, was dismissed after the parties stipulated to Count V's dismissal. Doc. #87. As it relates to AMEC Plaintiffs' Amended Complaint, the Court is left with counts alleging violations of both federal and state law. The Court will address the merits of these claims in a manner that does not involve state law. Furthermore, the entry of an appearance and filing of an answer, in which the state asserted sovereign immunity, does not amount to a waiver of the state's immunity.

As AMEC Plaintiffs note, "[g]ranting the Motion to Dismiss the State of Missouri would have no practical effect on this litigation." Doc. #49, at 6 n.1. While state officials may be sued under *Ex Parte Young*, this doctrine does not extend to states. *See Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007). Finding the State of Missouri is immune from suit under the Eleventh Amendment, and no exception to the general rule applies, the Court grants Defendants' motion to dismiss the State of Missouri.

Defendants also moved to dismiss all state-law claims presented in AMEC Plaintiffs' Amended Complaint. Defendants argue the Court lacks subject matter jurisdiction because Plaintiffs invoked jurisdiction only under 28 U.S.C. § 1331, which provides jurisdiction over claims invoking federal law. This Court has supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). The Court addresses the merits of Plaintiffs claims under the United States Constitution, and does not consider Plaintiffs' claims under the Missouri Constitution. Accordingly, the Court dismisses the state-law claims without prejudice. The Court grants Defendants' first motion to dismiss (Doc. #28).

## (2) Second Motion to Dismiss

In their second motion to dismiss, Defendants seek dismissal of all claims by both sets of plaintiffs. Defendants give four reasons why the Court should grant their second motion to dismiss. First, Defendants argue Plaintiffs mistake the actual requirements of Section 23, and accordingly, Plaintiffs' lack standing, and their claims are not ripe.[11] Second, Defendants admit Section 23's ban on corporate and union contributions to ballot measure committees violates the United States Constitution, and state the MEC will not enforce that provision. Accepting Defendants' position on these two points would lead the Court to conclude Plaintiffs do not have standing and their claims are not ripe. Third, Defendants contend the remaining challenged portions of Section 23 are lawful restraints on political activity. Accepting Defendants' position on this point would lead the Court to conclude Plaintiffs fail to state a claim because Section 23's provisions are lawful. Fourth, Defendants point to their first motion to dismiss, noting claims against the State of Missouri and AMEC Plaintiffs' state-law claims should be dismissed. The Court has already addressed this final argument. *See* Section II.A.(1).

## (a) Standing and Ripeness Legal Standards

The "irreducible constitutional minimum" of standing has three elements. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). A plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan*, 504 U.S. at

---

[11] First, Defendants argue Plaintiffs mistake Section 23.3(1)(a)'s $2,600 contribution limit as applying in aggregate to all contributions per election to all candidates combined. Second, Defendants argue Plaintiffs mistakenly allege Section 23.3(1)(a)'s $2,600 contribution limit is unconstitutionally vague because it is not clear how the limit applies when Plaintiffs contribute to multicandidate PACs. Third, Defendants argue Plaintiffs mistakenly construe the $2,600 contribution limit as applying to contributions to PACs that only make independent expenditures. Fourth, Defendants argue Plaintiffs mistakenly contend Section 23.3(16)(c) prevents contributions to PACs from corporations not organized under chapter 347 of the Missouri Revised Statutes. The Court will address these alleged mistakes when considering the merits of Plaintiffs' motions to permanent injunction.

560-61; *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)).  An "injury-in-fact" is "realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Iowa Right to Life Comm., Inc. v. Tooker*, 717 F.3d 576, 584 (8th Cir. 2013) (quoting *St. Paul Area Chamber of Commerce v. Gaetner*, 439 F.3d 481, 485 (8th Cir. 2006)).

Two types of injuries can confer standing in the First Amendment context when a plaintiff seeks prospective relief. *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 794 (8th Cir. 2016) (citations omitted).  First, a plaintiff can establish standing by alleging "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Id.* (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).  A threat of future or present prosecution must be "credible" rather than "wholly speculative." *Iowa Right to Life Comm.*, 717 F.3d at 584 (citations omitted).  Second, a plaintiff can establish standing by alleging it self-censored. *Missourians for Fiscal Accountability*, 830 F.3d at 794 (citing *281 Care Comm. v. Arneson*, 638 F.3d 621, 627 (8th Cir. 2011)).  "A party need not expose itself to arrest or prosecution under a criminal statute to challenge it in federal court." *Iowa Right to Life Comm.,* 717 F.3d at 584.  A party suffering from a credible threat of future prosecution suffers from an ongoing injury resulting from the statute's chilling effect on his desire to exercise his First Amendment rights. *Missourians for Fiscal Accountability*, 830 F.3d at 794 (citations omitted).

Faced with a claim of self-censorship, the Court must consider whether a party's decision to chill its speech in light of the challenged statute was objectively reasonable. *Id.* (citing *281 Care Comm.*, 638 F.3d at 627) (quotations omitted)).  Although complaints against plaintiffs may not reach the criminal stage or prosecution may not be threatened, non-criminal consequences contemplated by a challenged statute may contribute to the objective reasonableness of an alleged chill. *Id.*

In addition to finding Plaintiffs have standing to bring their claims, the Court must determine whether Plaintiffs' claims are ripe for review.  Rather than prematurely adjudicating a dispute, the ripeness doctrine prevents Courts "from entangling themselves in abstract disagreements over administrative policies, and also protects the

agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Id.* at 796 (quoting *Nat'l Right to Life Political Action Comm. v. Connor*, 323 F.3d 684 (8th Cir. 2003)). "To decide ripeness, courts consider: (1) the hardship to the plaintiff caused by delayed review; (2) the extent to which judicial intervention would interfere with administrative action; and (3) whether the court would benefit from further factual development." *Id.* at 796-97 (citation omitted). The touchstone of a ripeness inquiry is whether the harm asserted has matured enough to warrant judicial intervention. *Id.* at 797 (citation and quotations omitted).

### (b) Advisory Opinions

The MEC issued advisory opinions after receiving inquiries from various entities. Defendants argue these advisory opinions accurately represent how Section 23 will be enforced, and are binding legal authorities establishing Plaintiffs will not suffer criminal or civil penalties if they engage in the challenged conduct. On that basis, Defendants argue Plaintiffs lack standing because the advisory opinions establish Plaintiffs do not face a credible threat of enforcement if they engage in the challenged conduct. Plaintiffs argue these opinions are outside the scope of the MEC's authority, inaccurately interpret the law, are not final, binding opinions, and Section 23 does not expressly delegate authority to the MEC to issue interpretative advisory opinions.

The MEC has statutory authority to issue advisory opinions "regarding any issue that the commission can receive a complaint on pursuant to Section 105.957." Mo. Rev. Stat. § 105.955.16(1). Section 105.957 enumerates provisions on which the MEC may receive a complaint. Mo. Rev. Stat. § 105.957.1(1)-(6). Relevant to Plaintiffs' challenge, the MEC may receive complaints regarding alleged violations of "the constitution...relating to the official conduct of officials or employees of the state and political subdivisions." Mo. Rev. Stat. § 105.957.1(6). Plaintiffs note Defendants' advisory opinions on provisions of Section 23 do not relate to the conduct of officials or state employees. Nor does Section 23 expressly grant the MEC authority to receive a

complaint on the provisions at issue in this matter.  *See generally* Section 23.[12]  Given the uncertainty of whether the MEC has authority to issue these advisory opinions, Plaintiffs urge the Court to confer standing to bring their claims.

If the MEC has authority to issue these advisory opinions, Plaintiffs argue an advisory opinion may be withdrawn at any time by the MEC, the state legislature's Joint Committee on Administrative Rules, or the General Assembly.  *See* Mo. Rev. Stat. § 105.955.16(1).  During the hearing in this matter, the Court requested supplemental briefing regarding whether previous MEC advisory opinions were rescinded, other than in response to legislation superseding prior opinions.  All parties filed supplemental briefing on the matter.  Docs. #76-78.  Defendants state sixteen advisory opinions, of 407 total, were rescinded, and twelve of those rescissions occurred in response to new legislation.  Plaintiffs recognize several advisory opinions were rescinded after legislative changes, but they cite to advisory opinions withdrawn after the MEC determined the opinion incorrectly interpreted the law, an allegation made regarding several advisory opinions at issue here.  Plaintiffs also cite to an advisory opinion regarding the Missouri Constitution's nepotism clause that was allegedly withdrawn *sua sponte* by the MEC.

Defendants note passage of section 105.957, delineating issues on which the MEC may receive complaints, predates passage of Section 23, and argue the MEC has inherent authority to interpret the law given its regulatory and administrative function overseeing Missouri's campaign finance laws.  This is a reasonable position.  Plaintiffs argue the advisory opinions exceed the MEC's authority, incorrectly interpret the law, and do not provide reliable guidance on what conduct may be lawful because Plaintiffs fear the opinions may be withdrawn.  On the record before the Court, this is also a reasonable position.

While the Court has doubts that the potential rescission of an advisory opinion would expose Plaintiffs to liability for an alleged violation occurring before rescission, the Court need not decide whether the MEC exceeded its authority by issuing advisory

---

[12] Section 23.4(1) allows the MEC to receive complaints from any person alleging a violation of Section 23 "by any candidate for elective office."  The provisions at issue in this matter do not challenge conduct by a candidate for elective office.

opinions interpreting Section 23 to address the merits of this matter.  Regardless of the validity of the advisory opinions, both parties advance arguments related to whether the text of Section 23 violates the First Amendment and other constitutional provisions.  As explained below, the Court finds Plaintiffs have standing, and their claims are ripe for the Court's review.

### (c) Plaintiffs' Standing and Ripeness of Claims

Plaintiffs allege Section 23 affects their ability to contribute to various entities and/or accept contributions from entities.  AMEC-PAC desires to accept contributions from its domestic and foreign member organizations not organized under chapters 347 through 360, but alleges Section 23 prevents it from accepting these contributions.[13] AMEC-PAC further alleges it donated to other PACs in the past, and would do so again in the future, but Section 23 prohibits it from doing so.  Legends Bank made contributions to PACs in the past, but alleges Section 23 now prohibits these contributions because Legends Bank is not organized under chapters 347 through 360. John Kleeba, Legends Bank's President, Chairman of the Board, and General Counsel, testified he made a contribution to the Missouri Bankers Association PAC days after Section 23 became effective, but the contribution was returned.  Kleeba further testified Legends Bank stopped making contributions at this time.

FFEF wants to accept contributions from other Plaintiffs, but will not because it fears investigation, prosecution, and sanctions.  FFEF intends to raise funds in unlimited amounts and use contributions to make independent expenditures in support of one or more candidates in the 2018 Republican primary for Missouri State Auditor.[14]  Worker Freedom wants to accept contributions from ADA, HSI, and Farmers, but will not accept these contributions because it fears investigation, prosecution, and sanctions.  Elliott

---

[13] AMEC has at least one member that is not a Missouri domestic corporation, and is not authorized to do business in Missouri pursuant to chapter 347.  Case No. 17-4006, Doc. #28, at 3.

[14] FFEF will not use funds to make contributions, whether direct or in-kind to candidates or candidate committees, except FFEF may contribute to other committees that also intend to make only independent expenditures and do not make contributions to candidates or political parties.  FFEF does not engage in coordination with candidates, candidate committees, political parties, or political party committees.

wants to contribute in excess of $2,600 to FFEF for the purpose of making independent expenditures, and separately to candidate committees of more than one candidate in the 2018 Republican primary for Missouri State Auditor, but not more than $2,600 to any single candidate. Elliott will not make these contributions because he fears investigation, prosecution, and sanctions. ADA wants to make a contribution in excess of $2,600 per election to FFEF. Further, ADA would make a contribution to Worker Freedom, but will not because it fears investigation, prosecution, and sanctions. HSI wants to contribute in excess of $2,600 per election to FFEF and would contribute to Worker Freedom, but will not because it fears investigation, prosecution, and sanctions. Farmers wants to make a contribution in excess of $2,600 per election to FFEF and would make a contribution to Worker Freedom, but will not because it fears investigation, prosecution, and sanctions.

In this First Amendment case, Plaintiffs must demonstrate there is a credible threat of enforcement or they engaged in self-censorship to establish standing. Relying on Plaintiffs' alleged misinterpretations of Section 23 and recent advisory opinions, Defendants argue Plaintiffs do not face a credible threat of enforcement. A defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. *See City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289 (1982); *United States v. W.T. Grant Co.,* 345 U.S. 629, 632 (1953). As discussed above, the Court finds Plaintiffs' hesitancy to rely on the MEC's advisory opinions reasonable. Although the MEC has not brought an enforcement action against Plaintiffs, the Court cannot determine Plaintiffs face no credible threat of prosecution in light of Plaintiffs' challenges to Section 23's plain language.[15]

---

[15] In response to the Court's questions regarding whether a county prosecutor may file charges for violations of Section 23, Defendants stated "[n]othing in Chapter 56 and nothing in the Missouri Constitution would prevent a prosecutor from filing charges arising out of violations of" Section 23.3(14) (prohibiting transfers to committees with the intent to conceal the true source of the contribution), and Section 23.6(1) (stating "[a]ny person who purposely violates the provisions of section 3 of this Article is guilty of a class A misdemeanor."). Doc. #75. Although a county prosecutor could bring charges for these violations, Defendants contend this Court cannot address this alleged chill because Plaintiffs did not name a county prosecutor as a defendant in this matter. The

Plaintiffs' strongest argument in favor of standing is their self-censorship. Self-censorship must be objectively reasonable. *Missourians for Fiscal Accountability*, 830 F.3d at 794. As detailed above, Plaintiffs allege Section 23 prohibits them from receiving and making their desired contributions. Violations of Section 23 may result in criminal and monetary sanctions. Given confusion regarding the validity of the advisory opinions, and confusion regarding what conduct Section 23 proscribes, Plaintiffs' self-censorship is objectively reasonable. Thus, Plaintiffs have standing.

Next, the Court must determine whether Plaintiffs' claims are ripe for adjudication. The parties agree two claims are ripe: (1) Section 23.3(12)'s prohibition on contributions by entities not formed under chapters 347 through 360, and (2) Section 23.3(12)'s prohibition on PAC to PAC contributions. However, again relying on advisory opinions and Plaintiffs' alleged misinterpretations of Section 23, Defendants argue Plaintiffs' remaining claims are not ripe because Plaintiffs do not face criminal or civil penalties for the conduct in which they wish to engage.

"To decide ripeness, courts consider: (1) the hardship to the plaintiff caused by delayed review; (2) the extent to which judicial intervention would interfere with administrative action; and (3) whether the court would benefit from further factual development." *Id.* at 796-97 (citation omitted). Plaintiffs have refrained from making or receiving desired contributions, and the Court heard testimony regarding Legends Bank's contribution to the Missouri Bankers Association being returned because Section 23 prohibited the contribution. Delayed review of the provisions at issue will further impose on Plaintiffs' ability to participate in political conduct in which they wish to engage. Further, the MEC issued advisory opinions interpreting Section 23, and in this regard, there is no judicial interference with any administrative action. Finally, the Court has received extensive briefing and heard testimony on these issues. Further factual development is not needed. Given these circumstances, the Court finds Plaintiffs' claims are ripe.

The Court denies Defendants' second motion to dismiss (Doc. #30) because the Court finds Plaintiffs have standing and their claims are ripe. In light of the parties'

---

Court need not determine Plaintiffs' speech was chilled on account of fear of prosecution by a county prosecutor.

proposed consent judgment, the Court also finds claims related to Section 23's ballot measure ban should not be dismissed. Defendants' arguments that several aspects of Section 23 are lawful will be addressed below in the Court's discussion of the merits of Plaintiffs' motions for injunctive relief.

## B. Permanent Injunction

As detailed above, Plaintiffs initially sought preliminary injunctions. Given the nature of this case and the need for a timely resolution, the Court converted the hearing on Plaintiffs' preliminary injunction motions to a hearing on Plaintiffs' requests for permanent injunction. Doc. #63. To obtain a preliminary injunction against an allegedly unconstitutional state law, a plaintiff must prove the injunction's necessity under the factors set forth in *Dataphase Systems, Inc., v. C L Systems, Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 316 (8th Cir. 2009). These factors are: (1) a "threat of irreparable harm to the movant"; (2) "the state of balance between this harm" and any injury that granting the injunction will cause to others; (3) the "probability that movant will succeed on the merits"; and (4) "the public interest." *Dataphase*, 640 F.2d at 114. "While no single factor is determinative, the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (internal quotations and citations omitted). For a First Amendment challenge, if a plaintiff does not show a likelihood of success on the merits, it likely has not met the remaining requirements for preliminary injunction. *Powell v. Noble*, 798 F.3d 690, 702 (8th Cir. 2015). "When a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (hereinafter "MCCL") (quoting *Phelps–Roper v. Troutman,* 662 F.3d 485, 488 (8th Cir. 2011)).

"The standard for issuing a preliminary or permanent injunction is essentially the same, excepting one key difference: a permanent injunction requires the moving party to show actual success on the merits, rather than the fair chance of prevailing on the merits required for a preliminary injunction. *See Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008); *Randolph v. Rodgers,* 170 F.3d 850, 857

(8th Cir.1999).  If a court finds a movant is actually successful on the merits, it then considers the following factors in deciding whether to grant a permanent injunction:  (1) the threat of irreparable harm to the moving party; (2) the balance of harms with any injury an injunction might inflict on other parties; and (3) the public interest.  *See Planned Parenthood*, 530 F.3d at 729 n.3; *Dataphase*, 640 F.2d at 113.

The Court first addresses the merits of Plaintiffs' claims.  Finding partial success on the merits, the Court details appropriate injunctive relief.

### (1) Level of Scrutiny

The Court must determine what level of scrutiny applies to Plaintiffs' claims.  The Supreme Court has set forth different standards of review for different kinds of campaign finance regulations.  *Wagner v. F.E.C.*, 793 F.3d 1, 5 (D.C. Cir. 2015) (citing *Buckley v. Valeo*, 424 U.S. 1, 19-25 (1976); *McCutcheon v. F.E.C.*, 134 S. Ct. 1434, 1444 (2014)).  Laws limiting independent expenditures on electoral advocacy are subject to strict scrutiny.  *Id.* (citing *McCutcheon*, 134 S. Ct. at 1444); *see, e.g.*, *Citizens United v. F.E.C.*, 558 U.S. 310, 339-41 (2010)).  Laws regulating campaign contributions "are subject to a lesser, but still rigorous standard of review because contributions lie closer to the edges than to the core of political expression."  *Id.* (citing *F.E.C. v. Beaumont*, 539 U.S. 146, 161 (2003)) (internal quotations omitted).  The applicable standard of review for a law regulating campaign contributions requires the state to demonstrate a sufficiently important interest and to employ means closely drawn to avoid unnecessary abridgement of associational freedoms.  *Id.*  Demonstrating a law is "closely drawn" requires "'a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served[;]...that employs not necessarily the least restrictive means but...a means narrowly tailored to achieve the desired objective.'"  *Wagner*, 793 F.3d at 21 (quoting *McCutcheon*, 134 S. Ct. at 1456-57).  The Eighth Circuit, of course, follows the Supreme Court's different standards of review.  *See MCCL*, 692 F.3d at 878 (stating "[p]ut simply, 'restrictions on contributions require less compelling justification than restrictions on independent spending.'") (quoting *Beaumont*, 539 U.S. at 158-59).

AMEC Plaintiffs urge the Court to apply strict scrutiny to invalidate portions of Section 23. They argue strict scrutiny applies because laws burdening political speech are subject to strict scrutiny. *See Citizens United*, 558 U.S. at 340; *MCCL*, 692 F.3d at 878 ("[c]ontributing to a political campaign is a form of political speech, as well as association.") (citing *Buckley*, 424 U.S. at 20-21)). However, the Supreme Court, in *Citizens United*, recognized the "variance in the rigor of scrutiny used to review independent expenditures and contributions...and neither endorsed nor condemned the distinction." *MCCL*, 692 F.3d at 878. The Supreme Court has repeatedly applied the "closely drawn" standard to challenges to campaign contribution restrictions. *See Wagner*, 793 F.3d at 5 n.3 (collecting cases). Furthermore, the Supreme Court has not revisited *Buckley*'s distinction between contributions and expenditures, nor the distinction between standards of review for these types of activities. *Wagner*, 793 F.3d at 5 n.4 (collecting cases).

In *Beaumont*, the Supreme Court applied the "closely drawn" test to uphold a federal law banning direct corporate campaign contributions. *Beaumont*, 539 U.S. at 149. The suggestion that *Citizens United* overruled *Beaumont* or "cast doubt" on its precedential value has floated throughout various courts in the years after *Citizens United* was decided. *See, e.g.*, *Wagner*, 793 F.3d at 6; *MCCL*, 692 F.3d at 879 n.12. However, the Eighth Circuit declined to disregard *Beaumont*, and applied the "closely drawn" standard to a Minnesota law prohibiting corporate contributions to political candidates and committees. *MCCL*, 692 F.3d at 879. The "closely drawn" standard remains applicable in reviewing a law banning or limiting campaign contributions. *Wagner*, 793 F.3d at 6 (collecting cases applying the "closely drawn" standard).

Plaintiffs do not allege Section 23 prevents them from making independent expenditures in support or opposition of a candidate. Plaintiffs allege Section 23 prevents them from making and receiving contributions among themselves and other entities. FFEF Plaintiffs also present a challenge to Section 23.3(1)(a)'s $2,600 contribution limit. Although a contribution limit burdens speech, it is not subject to strict scrutiny. *See Beaumont*, 539 U.S. at 162 ("It is not that the difference between a ban and a limit is to be ignored; it is just that the time to consider it is when applying scrutiny

at the level selected, not in selecting the standard of review itself."). Accordingly, the Court will apply the "closely drawn" standard to Plaintiffs' claims.

### (2) Interests Advanced by the State

Defendants must assert a sufficiently important interest in support of Section 23. Defendants assert Section 23 promotes the important interests in preventing corruption or the appearance thereof, promoting transparency, and preventing circumvention of campaign finance regulations.[16] The Supreme Court has repeatedly held the government's interest in preventing quid pro quo corruption or its appearance is sufficiently important to justify regulation of campaign contributions. *Wagner*, 793 F.3d at 8; *McCutcheon*, 134 S. Ct. at 1445; *Buckley*, 424 U.S. at 26-27. The Latin phrase, quid pro quo, captures the notion of a direct exchange of an official act for money, and such exchanges undermine the integrity of our system of representative democracy. *Wagner*, 793 F.3d at 8 (citations omitted). The interest in preventing quid pro quo corruption can even be a "compelling" interest that would satisfy strict scrutiny. *Wagner*, 793 F.3d at 8; *McCutcheon*, 134 S. Ct. at 1445.

The appearance of corruption is of equal concern because it can threaten the citizenry's confidence in the representative government system. *Wagner*, 793 F.3d at 8

---

[16] Section 23 states:

> The people of the State of Missouri hereby find and declare that excessive campaign contributions to political candidates create the potential for corruption and the appearance of corruption; that large campaign contributions made to influence election outcomes allow wealthy individuals, corporations and special interest groups to exercise a disproportionate level of influence over the political process; that the rising costs of campaigning for political office prevent qualified citizens from running for political officer; that political contributions from corporations and labor organizations are not necessarily an indication of popular support for the corporation's or labor organization's political ideas and can unfairly influence the outcome of Missouri elections; and that the interests of the public are best served by limiting campaign contributions, providing for full and timely disclosure of campaign contributions, and strong enforcement of campaign finance requirements.

§ 23.2.

(citing *Buckley*, 424 U.S. at 26-27). Failing to address corruption or the appearance thereof can give rise to the "cynical assumption that large donors call the tune [and] jeopardize the willingness of voters to take part in democratic governance." *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 390 (2000). The people of Missouri must have faith in elected officials and their appointees. *See Nixon*, 528 U.S. at 390 ("Democracy works only if the people have faith in those who govern, and that faith is bound to be shattered when high officials and their appointees engage in activities which arouse suspicions of malfeasance and corruption.") (citation and quotations omitted).

Transparency in the electoral process serves the important government interest to "provide information to the electorate about who is speaking – information that is vital to the efficient functioning of the marketplace of ideas, and thus to advancing the democratic objectives underlying the First Amendment." *Yamada v. Snipes*, 786 F.3d 1182, 1197 (9th Cir. 2015) (citations and internal quotations omitted). "[T]ransparency enables the electorate to make informed decisions and give proper weight to different speakers and messages." *Citizens United*, 558 U.S. at 371; *see also Ala. Democratic Conference v. Att'y Gen. of Ala.*, 838 F.3d 1057, 1065 (11th Cir. 2016) ("transparency is plainly related to and furthers the State's interest in preventing corruption and the appearance of corruption...."). In addition, an interest in preventing circumvention of valid contribution limits has been recognized as an important interest where there is concern about corruption or the appearance thereof. *See F.E.C. v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 456 (2001).

### (3) Merits of Plaintiffs' Claims
### (a) Ballot Initiative Ban

Section 23.3(3)(a) states "[i]t shall be unlawful for a corporation or labor organization to make contributions to a campaign committee, candidate committee, exploratory committee, political party committee or a political party...." § 23.3(3)(a). Section 23.3(16)(c) makes it unlawful for a "campaign committee, candidate committee, continuing committee, exploratory committee, political party committee, and political party" to knowingly accept contributions from "any foreign corporation that does not

have the authority to transact business in [Missouri] pursuant to chapter 347, RSMo, as amended from time to time." Section 23.7(6)(a) defines "campaign committee" as

> a committee, other than a candidate committee, which shall be formed by an individual or group of individuals, to receive contributions or make expenditures and whose sole purpose is to support or oppose the qualification and passage of one or more particular ballot measures in an election or the retention of judges under the nonpartisan court plan....

§ 23.7(6)(a).

Plaintiffs allege these provisions prevent them from contributing to a campaign committee formed for the purpose of supporting or opposing one or more ballot initiatives. A complete ban on corporate contributions to support or oppose ballot initiatives is unconstitutional. *See First Nat'l Bank v. Bellotti*, 435 U.S. 765, 795 (1978) (holding a Massachusetts statute prohibiting corporate expenditures on a tax referendum violated the First Amendment). Citing *Bellotti*, Defendants indicated, in briefing and during the hearing, they will not enforce Section 23's restrictions on corporate or union contributions to campaign committees whose only purpose is supporting or opposing ballot initiatives. Doc. #31, at 23, 35-37. Plaintiffs are not satisfied with Defendants' assurances because such assurances have no legally binding effect. At the conclusion of the hearing, counsel for all parties indicated a willingness to discuss a possible consent judgment this Court could enter to resolve this issue. Subsequently, the parties submitted a proposed consent order of permanent injunction. Doc. #86. Accordingly, the Court incorporates the parties' proposed consent judgment and will enjoin enforcement of Section 23's restrictions on corporate or union contributions to campaign committees whose sole purpose is supporting or opposing ballot initiatives.

### (b) Contribution Limits

FFEF Plaintiffs challenge Section 23.3(1)(a).[17] Section 23.3(1)(a) prohibits contributions in excess of $2,600 "made by or accepted from any person other than the candidate in any one election...[t]o elect an individual to the office of governor,

---

[17] AMEC Plaintiffs do not challenge Section 23.3(1)(a)'s contribution limit.

lieutenant governor, secretary of state, state treasurer, state auditor, attorney general, office of state senator, office of state representative or any other state or judicial office."

In Count V, Elliott alleges the $2,600 contribution limit applies to contributions made "per election" rather than "per election, per candidate."  Put another way, Elliott alleges Section 23 prevents him from making a $2,600 contribution to multiple candidates running for the same office – i.e., he must spread his $2,600 between hypothetical candidates A and B who are running for the same office enumerated in Section 23.3(1)(a).  For instance, if Elliott were to give $2,600 in a primary election to candidate A, but candidate A later drops out, Elliott alleges Section 23.3(1)(a) prevents him from then contributing to candidate B who remains in the race.

Defendants argue Section 23.3(1)(a) does not limit contributions to "one or more candidates," "multiple candidates" or "individuals."  Rather, the limit applies on contributions to "elect an individual" to a singular office enumerated in the provision. The limit plainly applies to contributions in a single election to elect a single individual to an office.[18]  This is not an aggregate limit that impermissibly "restricts how much money a donor may contribute in total to all candidates or committees." *McCutcheon*, 134 S. Ct. at 1442.  Rather, this is a permissible base limit that "restricts how much money a donor may contribute to a particular candidate or committee." *McCutcheon*, 134 S. Ct. at 1442.  Accordingly, Elliott's challenge is unfounded.

Count VI alleges Section 23.3(1)(a) prohibits ADA, Elliott, HSI, and Farmers from making contributions in excess of $2,600 to FFEF even though FFEF is an independent expenditure only committee.  ADA, Elliott, HSI, and Farmers construe Section 23.3(1)(a) as applying to all contributions made in an election, including contributions to PACs. Plaintiffs argue they could not contribute a maximum amount of $2,600 to candidate A, and then contribute additional funds to a PAC that makes independent expenditures in support of or directly contributes to candidate A.

---

[18] An "election" is "any primary, general or special election held to nominate or elect an individual to public office, to retain or recall an elected officeholder or to submit a ballot measure to the voters, and any caucus or other meeting of a political party or a political party committee at which that party's candidate or candidates for public office are officially selected.  A primary election and the succeeding general election shall be considered separate elections."  § 23.7(11).

Defendants argue Section 23.3(1)(a) does not apply to contributions to PACs that only make independent expenditures because a "contribution" does not include contributions to independent expenditure only committees.  Section 23.3(1)(a) does not specifically state the contribution limit applies to PAC contributions.  However, the definition of "contribution" does not specifically exclude contributions to an independent expenditure only committee.  § 23.7(7).  Defendants find support for their position in an advisory opinion issued by the MEC.  Advisory Opinion No. 2017.02.CF.003 states, "[i]t is the Commission's opinion that the contribution limits apply to candidate committees and only to continuing committees/political action committees if a contribution to that committee is restricted or designated for a candidate."  The MEC advises:

> In order to satisfy the intent of the limitation, the contributing person must intend for the contribution to be used for the election of an individual to one of the enumerated offices.  Therefore, the $2,600 contribution limit per election presumptively does not apply to contributions received by a continuing committee unless a contribution to a continuing committee has been restricted or designated for a candidate.  While the committee may ultimately expend money advocating for a specific individual during a campaign, the limitation specifically applies to 'contributions made by or accepted from any person.'  Thus, contributions made to enumerated candidates by a continuing committee/ political action committee are subject to the $2,600 limitation.

Advisory Opinion No. 2017.02.CF.003.  The MEC further states "previous Commission opinions also found that the contribution limits did not apply to contributions received by continuing committees..., nor to campaign committees...."  *Id.*  The Court will enjoin enforcement of Section 23.3(1)(a) in a manner inconsistent with Advisory Opinion No. 2017.02.CF.003.

In Count VII, Elliott and FFEF allege Section 23.3(1)(a) is void for vagueness in that a person of ordinary intelligence cannot discern what conduct is prohibited under the amendment.  Section 23.3(1)(a) is not a model of statutory clarity, but Elliott and FFEF strain to interpret it in a manner that would result in finding it unconstitutional.  The plain language indicates contributions to elect an individual to an office shall not exceed $2,600 in a single election.  For what it is worth, the MEC's advisory opinion clarifies Section 23.3(1)(a)'s applicability to contributions made to a PAC – the MEC will not enforce the $2,600 limit on contributions to a PAC unless the contribution is

specifically designated for an individual candidate.  Advisory Opinion No. 2017.02.CF.003.  At the hearing, Defendants indicated they do not oppose entry of an injunction formalizing the MEC's advisory opinions.  The Court will enjoin the MEC from interpreting Section 23.3(1)(a) in a manner inconsistent with Advisory Opinion No. 2017.02.CF.003.

### (c) Prohibitions on Entities Not Formed Under Chapters 347 through 360

The Court now turns to Plaintiffs' challenge to Section 23's prohibitions on the sources of certain types of contributions.  First, Plaintiffs challenge Section 23.3(16)(c), which provides "[n]o campaign committee, candidate committee, continuing committee, exploratory committee, political party committee, and political party shall knowingly accept contributions from:  Any foreign corporation that does not have the authority to transact business in [Missouri] pursuant to Chapter 347, RSMo, as amended from time to time."  § 23.3(16)(c).  Chapter 347 governs only limited liability companies ("LLC").  Second, Plaintiffs challenge Section 23.3(12), which provides "[p]olitical action committees shall only receive contributions from individuals; unions; federal political action committees; and corporations, associations, and partnerships formed under chapters 347 to 360, RSMo, as amended from time to time."  § 23.3(12).  Chapters 347 through 360 govern corporations, associations, and partnerships.

### (i) Foreign Corporations

Plaintiffs' first challenge involves Section 23.3(16)(c)'s prohibition on receiving contributions from foreign LLCs, unless the LLC has a certificate of authority to do business in Missouri.[19]  On its face, Section 23.3(16)(c) bans contributions from foreign entities unless the contributing entity is an LLC authorized to do business in Missouri. Defendants cannot and do not attempt to argue otherwise.  However, Defendants present an MEC advisory opinion interpreting this section, which states:

---

[19] AMEC Plaintiffs' Count I specifically attacks this provision, claiming the limitation is facially unconstitutional and unconstitutional as-applied to Plaintiffs.  FFEF Plaintiffs' Count I broadly raises a challenge to the source contributions in Sections 23.3(12) and (16)(c), but overlaps with a challenge to the heavily regulated entities prohibitions discussed *infra*.

§ 23.3(12) provides specific authorization for political action committees to receive contributions from corporations, associations and partnerships formed under those chapters, and § 23.3(16) appears to include a prohibition for foreign corporations although referencing only one chapter of the Missouri Revised Code. It is the Commission's opinion that when both sections are read together, and because the legislature has expressly stated in those chapters listed in § 23.3(12) that foreign corporations and other business entities shall have the same rights and privileges as domestic corporations and business entities, political action committees can receive contributions from foreign corporations, associations or partnerships, holding valid certificates of authority to do business in this state under chapters 347 to 360, RSMo.

Consistent with this analysis, the Commission interprets the prohibition on contributions to foreign corporations in § 23.3(16)(c) not to extend to foreign corporations that have registered to do business in the state under Chapters 347 to 360, RSMo....

Advisory Opinion No. 2017.02.CF.006.

Chapters 347 through 360 provide a foreign corporation with a certificate of authority to do business in Missouri has the same rights and privileges as an in-state corporation. Mo. Rev. Stat. §§ 351.582.2, 356.031, 358.500, 358.510, 347.157. HSI, a for-profit corporation organized under Kansas laws, has a certificate of authority to transact business in Missouri pursuant to chapter 351. AMEC Plaintiffs' Amended Complaint lists KAMO Power, an Oklahoma corporation authorized to do business in Missouri pursuant to chapter 355, as a rural electric cooperative that has contributed to AMEC-PAC in the past, and wishes to do so in the future. AMEC-PAC believes Section 23.3(16)(c) prohibits it from receiving KAMO Power's contribution, but Advisory Opinion No. 2017.02.CF.006 indicates such a contribution is lawful in the MEC's view.

As with several challenges in this matter, Defendants argue their advisory opinions are legally binding, and therefore, the Court should find this claim is not ripe because these foreign corporations have authority to transact business in Missouri under chapters 347 through 360. Although the MEC's advisory opinion potentially provides clarity about Section 23.3(16)(c)'s application, the Court finds the entry of a permanent injunction enjoining enforcement of Section 23.3(16)(c) in a manner inconsistent with Advisory Opinion No. 2017.02.CF.006 appropriate. Accordingly, the

Court will enjoin enforcement of Section 23.3(16)(c) in a manner inconsistent with Advisory Opinion No. 2017.02.CF.006.

### (ii) Prohibition on Heavily Regulated Industries

Plaintiffs' second challenge involves the source prohibition on corporate entities found in Section 23.3(12), which restricts PACs to receiving contributions only from corporations, associations, and partnerships formed under chapters 347 through 360. Defendants term this limitation as one banning "heavily regulated industries" from contributing to PACs. While direct contributions to candidates, committees, and political parties by all corporations and unions are prohibited by Section 23.3(3)(a), Section 23.3(12) imposes a further restriction by banning contributions to PACs by these heavily regulated industries.

Defendants define a heavily regulated entity as one not formed under chapters 347 through 360. Although not an exhaustive list, businesses in a heavily regulated industry, applying Defendants' definition, include state-chartered banks and trust companies (chapters 362 and 363), loan and investment companies (chapter 368), savings and loan associations (chapter 369), credit unions (chapter 370), development finance corporations (chapter 371), fraternal benefit societies (chapter 378), insurance companies (chapter 375 through 385), railroad corporations (chapter 388), telegraph and telephone companies (chapter 392), and cooperative, nonprofit, membership corporations (chapter 394). Businesses in these heavily regulated industries may make independent expenditures, and may establish continuing committees for contributions from members or shareholders that can then donate to candidates or other groups. § 23.3(3)(a).

The ban on PAC contributions by businesses in heavily regulated industries affects multiple Plaintiffs. AMEC's member rural electric cooperatives are organized under chapter 394, and these organizations have contributed and wish to continue contributing to AMEC-PAC. Legends Bank and Farmers are state-chartered banks organized under chapter 362 that wish to contribute to PACs. Defendants maintain the ban on heavily regulated industries is constitutional, while Plaintiffs argue the ban is not closely drawn to a sufficiently important interest.

All parties agree *Blount v. Securities Exchange Commission*, 61 F.3d 938 (D.C. Cir. 1995), should guide the Court's review of this issue. There, regulators of municipal securities markets investigated reports of "ethically questionable practices" by municipal bond traders and became concerned these practices "were becoming more prevalent and were undermining the integrity of the $250 billion municipal securities market." 61 F.3d at 939. In response to this concern, the Securities Exchange Commission ("the Commission") approved new rules restricting the "ability of municipal securities professionals to contribute to and to solicit contributions to the political campaigns of state officials from whom they obtain business." *Id.* Under the new rules, a municipal securities professional is prohibited from engaging with an official of an issuer for a period of two years if the professional contributed to the official. *Id.* at 940. A contribution to a PAC is treated as a contribution to the official if the PAC is controlled by the official or "any municipal finance dealer whatsoever." *Id.* Further, the two-year restriction is not triggered by a contribution of less than $250 per official, per election, and if the securities professional is entitled to vote for the official. *Id.*

Applying strict scrutiny, the District of Columbia Circuit Court upheld the rule under First and Tenth Amendment challenges.[20] *Id.* at 949. Despite the lack of specific evidence of a quid pro quo, the court noted:

> underwriters' campaign contributions self-evidently create a conflict of interest in state and local officials who have power over municipal securities contracts and a risk that they will award the contracts on the basis of benefit to their campaign chests rather than to the governmental entity.

*Id.* at 944-45. In approving the rule, the Commission noted specific allegations of abuse in local and state governments, and cited newspaper clippings from thirteen states and the District of Columbia bolstering these allegations. *Id.* The court noted, "[a]lthough the record contains only allegations, no smoking gun is needed where...the conflict of

---

[20] After a detailed analysis of whether the rule was content-based or content-neutral in light of the rule's suppression of speech, the court was "hesita[ant] to find the rule content-neutral." *Blount*, 61 F.3d at 943. The parties here engage in a brief discussion of whether this Court should apply strict scrutiny to Section 23 because the law seemingly favors content of certain corporations over others. As the Court explained above, application of the "closely drawn" standard here is appropriate given its application in the campaign finance context. *Wagner*, 793 F.3d at 6.

interest is apparent, the likelihood of stealth great, and the legislative purpose prophylactic." *Id.* (citing *F.E.C. v. Nat'l Right to Work Comm.*, 459 U.S. 197, 210 (1982)).

In light of the record, the court upheld the narrow rule. The rule applied only to the two potential parties to a quid pro quo, and did not apply to business awarded on a competitive basis. *Id.* at 947 n.5. The rule restricted only a narrow range of activity for a relatively short period of time. *Id.* Lastly, the court noted several ways the rule did not restrict political activity, such as the ability to make direct expenditures, give speeches, volunteer for political candidates, generally solicit support as opposed to requesting money, and solicit funds for a political party. *Id.* at 948.

Section 23.3(12) is distinguishable from the rule at issue in *Blount*. The rule in *Blount* is a targeted prohibition on contributions directly to a candidate, and only for a limited period of time. Section 23.3(12) is a complete prohibition on contributions to PACs by entities not formed under chapters 347 through 360. The Supreme Court has held, "there is not the same risk of quid pro quo corruption or its appearance when money flows through independent actors to a candidate, as when a donor contributes to a candidate directly." *McCutcheon*, 134 S. Ct. at 1452. The possibility of a quid pro quo between municipal bond traders and local and state governments is apparent in a direct contribution, but is not apparent in this case, where a PAC independently contributes to a candidate.

In addition to *Blount*, Defendants direct the Court to several cases purportedly supporting an outright ban on PAC contributions by businesses in heavily regulated industries. While a "particular threat to the integrity of State government posed by political contributions from participants in [a] tightly regulated industry" may be found in direct contributions to candidates, none of Defendants' cited cases stand for the proposition that an outright ban on PAC contributions passes constitutional muster. *See, e.g.*, *Green Party of Conn. v. Garfield*, 616 F.3d 189, 213 (2d Cir. 2010) (upholding a limited portion of a statute prohibiting state contractors from making campaign contributions directly to candidates for state office); *In re Earle Asphalt Co.*, 950 A.2d 918, 923 (N.J. Super. 2008) (upholding a statute preventing a state agency from awarding a contract with a value over $17,500 to a business entity that contributed more

than $300 during the preceding eighteen months to the Governor, candidates for Governor, or any state or county political party); *Gwinn v. State Ethics Comm'n*, 426 S.E.2d 890, 892 (Ga. 1993) (upholding a statute that prohibited insurance companies from making campaign contributions to candidates for or occupants of the Office of Commissioner of Insurance).

While prohibitions on a limited class of businesses or individuals have been upheld, Section 23.3(12) draws no such distinction beyond a large grouping of businesses in what Defendants term heavily regulated industries. *See, e.g.*, *Wagner*, 793 F.3d at 22 (upholding a ban on indirect and direct contributions to any political party, committee, or candidate by federal contractors during the period of contract negotiation and performance); *Casino Ass'n of La. v. State ex rel. Foster*, 820 So.2d 494, 495 (La. 2002) (upholding a statute prohibiting campaign contributions by riverboat and land-based casino industries); *In re Petition of Soto*, 565 A.2d 1088, 1106 (N.J. Super. 1989) (upholding a statute prohibiting a casino officer or key employee from contributing to a candidate for public office or any party or group organized to support such a candidate).

Defendants have not demonstrated Section 23.3(12)'s ban on PAC contributions by either state-chartered banks or rural electric cooperatives is closely drawn to the government's interests. Defendants indicated they developed a list of heavily regulated industries by researching the chapters under which the business is formed and examining the regulations imposed on the business or industry, but the Court can find little commonality among these businesses other than being organized outside title XXIII of the Missouri Revised Statutes. Certainly, not every business entity organized outside title XXIII is involved in a highly regulated industry. Defendants cite a particular danger of corruption or the appearance of corruption because these businesses are heavily regulated by the legislators to whom they wish to contribute. However, Section 23.3(12) is a ban on PAC contributions as opposed to contributions to candidates, and "there is not the same risk of quid pro quo corruption or its appearance when money flows through independent actors to a candidate, as when a donor contributes to a candidate directly." *McCutcheon*, 134 S. Ct. at 1452.

Contributions to a PAC by a rural electric cooperative do not implicate the concerns raised by Defendants. Public utilities are regulated by the Public Service Commission, an independent executive agency, on myriad issues. Rural electric cooperatives are regulated only on one, the issue of safety.[21] Defendants argue there is no buffer between rural electric cooperatives and their state representatives, and this lack of a buffer requires regulation of rural electric cooperatives' contributions because there is a heightened concern of quid pro quo and perceived corruption. That may be so, but Section 23.3(12) prohibits contributions to PACs, not direct contributions to candidates as in *Blount* and other cases cited by Defendants. The heightened risk of a quid pro quo exchange simply does not exist in a contribution to a PAC that independently decides how to spend a contributor's funds.

Likewise, Defendants do not establish a ban on contributions to a PAC by a state-chartered bank implicates the concerns they raised. The Court acknowledges a history of corruption or the appearance of corruption involving contributions by banking entities previously served as the basis for the implementation of campaign contribution limits in Missouri. *See Nixon*, 528 U.S. at 394-95. Defendants assert state-charted banks are properly characterized as a heavily regulated industry because chapter 362, and other regulations and statutes, impose numerous restrictions and requirements on state-chartered banks.[22] The financial industry faces complex laws and regulations, but the Court again fails to see how contributions to a PAC by a state-chartered bank raise the same risk of quid pro quo corruption or its appearance as a direct contribution to a candidate might.

---

[21] The Court also questions Defendant's identification of a rural electric cooperative as a heavily regulated industry. These entities generally do not seek business directly from the state; rather, they provide services to rural areas to which public utilities do not provide service. Moreover, Defendants have not shown rural electric cooperatives have been involved in corruption or even the appearance of corruption. The Court did not delve further into this particular issue because the Court finds this particular section is not narrowly drawn.

[22] The Court acknowledges the banking industry is more heavily regulated than rural electric cooperatives. However, Defendants fail to demonstrate state-chartered banks are a heavily regulated industry in which there is evidence of corruption or the appearance of corruption in PACs associated with state-chartered banks. To the extent Defendants argue otherwise, the Court finds Defendants' allegations are broad and generalized. This Court will not uphold Section 23.3(12)'s ban on PAC contributions.

Plaintiffs also bring a facial challenge to this portion of Section 23. As explained above, the Court finds Defendants have not demonstrated Section 23.3(12)'s ban on contributions to PACs from rural electric cooperatives organized under chapter 394, or state-chartered banks organized under chapter 362, is closely drawn to avoid unnecessary abridgement of Plaintiffs' First Amendment freedoms. As the Supreme Court has held, "there is not the same risk of quid pro quo corruption or its appearance when money flows through independent actors to a candidate, as when a donor contributes to a candidate directly." *McCutcheon*, 134 S. Ct. at 1452. Here, Section 23.3(12) prohibits contributions through independent actors, PACs, that do not raise the same risk of quid pro quo corruption or the appearance thereof. Consequently, the Court finds the outright ban on contributions to PACs by businesses not formed under chapters 347 through 360 is unconstitutional.

### (d) PAC to PAC Contribution Ban

Plaintiffs also allege Section 23.3(12)'s prohibition on PAC to PAC contributions is unconstitutional. Section 23.3(12) provides "[p]olitical action committees...shall be prohibited from receiving contributions from other political action committees, candidate committees, political party committees, campaign committees, exploratory committees, or debt service committees." § 23.3(12). A "political action committee" is defined as follows:

> a committee of continuing existence which is not formed, controlled or directed by a candidate, and is a committee other than a candidate committee, political party committee, campaign committee, exploratory committee, or debt service committee, whose primary or incidental purpose is to receive contributions or make expenditures to influence or attempt to influence the action of voters whether or not a particular candidate or candidates or a particular ballot measure or measures to be supported or opposed has been determined at the time the committee is required to file any statement or report pursuant to the provisions of this chapter. Such a committee includes, but is not limited to, any committee organized or sponsored by a business entity, a labor organization, a professional association, a trade or business association, a club or other organization and whose primary purpose is to solicit, accept and use contributions from the members, employees or stockholders of such entity and any individual or group of individuals who accept and use contributions to influence or attempt to influence the action of voters....

§ 23.7(20).  AMEC-PAC and FFEF allege they are unconstitutionally prohibited from making contributions to and receiving contributions from other PACs organized under Missouri law.  Defendants assert this prohibition is necessary to prevent corruption or the appearance of corruption, promote transparency in the flow of money, and prevent circumvention of Section 23's restrictions.

There are differences between FFEF and AMEC-PAC, and those differences affect the Court's analysis.  FFEF is a PAC whose purpose is to receive contributions and make independent expenditures to influence voters.  FFEF does not contribute to candidates or their committees.  FFEF does not intend to make contributions to political parties, and does not engage in coordination with candidates, candidate committees, political parties, or political party committees.

AMEC-PAC has contributed and wishes to contribute in the future to candidates and their committees.  AMEC-PAC has never accepted contributions specifically designated to be contributed to a candidate.  AMEC-PAC has received contributions from other PACs in the past and wishes to receive these contributions in the future.  Finally, AMEC-PAC has made contributions to other PACs in the past and wishes to do so again in the future.  The Court heard testimony from Klindt, AMEC's former Vice President and treasurer of AMEC-PAC, regarding AMEC-PAC's contributions to "Pork PAC" as an example of the types of contributions AMEC-PAC would make but for Section 23.3(12)'s ban on PAC to PAC contributions.

Although FFEF and AMEC-PAC challenge the constitutionality of Section 23.3(12)'s ban on PAC to PAC contributions, their challenges differ based upon the conduct in which each party wishes to engage.  FFEF's challenge is, in a sense, narrower.  FFEF seeks only for a judicial determination that Section 23.3(12) is unconstitutional when applied to PACs that only engage in independent expenditures.  AMEC-PAC brings a broader challenge, arguing the PAC to PAC contribution ban is unconstitutional when applied to PACs that contribute to candidates, as well as PACs that make independent expenditures.

**(i) Independent Expenditure Only PACs**

Defendants, in the context of this matter, state Section 23.3(12)'s ban does not apply to a PAC that seeks to receive funds from another PAC, but only uses its funds to make independent expenditures.  Defendants cite Section 23's definition of "contribution" to support their position.  Section 23.7(7) defines a "contribution" as follows:

> a payment, gift, loan, advance, deposit, or donation of money or anything of value for the purpose of supporting or opposing the nomination or election of any candidate for public office or the qualification, passage, or defeat of any ballot measure, or for the support of any committee supporting or opposing candidates or ballot measures or for paying debts or obligations of any candidate or committee previously incurred for the above purposes....

§ 23.3(7).  Defendants argue this language does not apply to contributions to PACs making only independent expenditures.  Furthermore, the MEC issued Advisory Opinion No. 2017.02.CF.004, which states, "[w]hile the Missouri Constitution and Chapter 130 do not specifically refer to 'independent expenditures,' the [MEC] has long given guidance that expenditures made by a candidate do not constitute contributions if those expenditures were 'not requested to be made by, directed or controlled by, or made in cooperation with, or made with the express or implied consent of the candidate.'"  The advisory opinion further states, "§ 23.3(4) and § 23.3(12) place prohibitions on contributions and not expenditures by a candidate committee to other candidate committees and political action committees/continuing committees."

Although Defendants indicate they will not enforce Section 23.3(12) in the manner feared by FFEF, case law is also instructive on this issue.  The Supreme Court has recognized "independent expenditures do not lead to, or create the appearance of, quid pro quo corruption."  *Citizens United*, 558 U.S. at 360.  Because an independent expenditure is political speech that is not coordinated with a candidate, a state's interest in preventing corruption or the appearance of corruption may not justify regulation of independent expenditures when a contribution to or coordination with a candidate is not present.  *See Ala. Democratic Conference*, 838 F.3d at 1066, *cert denied*, 2017 WL 1427593 (Apr. 24, 2017).  Circuit Courts throughout the country have applied this reasoning to invalidate laws limiting contributions to independent expenditure only

PACs. *See, e.g.*, *Republican Party of N.M. v. King*, 741 F.3d 1089, 1097 (10th Cir. 2013); *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 487 (2d Cir. 2013); *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 538 (5th Cir. 2013); *Wis. Right to Life State Political Action Comm. v. Barland*, 664 F.3d 139, 154 (7th Cir. 2011); *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1121 (9th Cir. 2011); *SpeechNow.org v. F.E.C.*, 599 F.3d 686, 696 (D.C. Cir. 2010) (en banc).

Defendants urge this Court to find FFEF's challenge is not ripe because Defendants interpret Section 23 in a way that does not injure FFEF. However, based on the case law described above, Section 23.3(12)'s prohibition against a PAC's contribution to another PAC is impermissible when applied to an independent expenditure only PAC. Although Defendants interpret "contribution" in a manner that does not encompass contributions to an independent expenditure only PAC, this interpretation is not apparent based on Section 23's language.[23] As Defendants admit, Section 23 does not define "independent expenditure," nor is it clear that a contribution to an independent expenditure only PAC from another PAC would not run afoul of Section 23.3(12). Given the case law on this issue, the Court will enjoin enforcement of Section 23.3(12) prohibiting FFEF from receiving a contribution from another PAC.

### (ii) PACs that May Contribute to Candidates and Other PACs

AMEC-PAC argues Section 23.3(12)'s PAC to PAC contribution ban is unconstitutional when applied to PACs that contribute to candidates, as well as PACs that make independent expenditures. AMEC-PAC argues there is no risk of corruption or the appearance of corruption in a PAC to PAC contribution, as opposed to the state's interest in regulating contributions directly to candidates which do raise a risk of corruption or the appearance thereof. Defendants argue a PAC to PAC contribution raises the risk of corruption or the appearance thereof, and the prohibition serves the

---

[23] Section 23 defines "contribution" as something given "for the support of any committee supporting or opposing candidates or ballot measures...." § 23.7(7). While an independent expenditure only PAC operates independent of a candidate and candidate committee, an independent expenditure is nonetheless made in support of a candidate or ballot measure. The Court fails to see how a contribution to an independent expenditure only PAC does not qualify as a "contribution" as defined by Section 23.7(7).

government's interest in preventing evasion or circumvention of Section 23's contribution limits to candidates.

Defendants direct the Court to case law in which a limit on contributions to a PAC was challenged.  In *California Medical Association v. Federal Election Commission*, 453 U.S. 182 (1981), the Supreme Court upheld a statute that prohibited individuals and unincorporated associations from contributing more than $5,000 per year to any "multicandidate political committee."[24]  453 U.S. at 185.  The Supreme Court examined *Buckley*, a contribution limits decision, and found a contributor's rights were not impaired by the statute's limit on contributions to a multicandidate political committee. *Cal. Med.*, 453 U.S. at 197.  The statute at issue in *California Medical Association* did not address PAC to PAC contributions.

The Eleventh Circuit's decision in *Alabama Democratic Conference v. Attorney General of Alabama*, 838 F.3d 1057 (2016), involves a prohibition on PAC to PAC contributions.  There, Alabama law prohibited a PAC designed to contribute to several candidates, like AMEC-PAC, from contributing to another PAC that also contributed to candidates.  838 F.3d at 1060.  The Eleventh Circuit found, as-applied to the plaintiff, the "ban serves an important anti-corruption interest while only marginally impacting political dialogue."  *Id.* at 1070.  Critically, Alabama's campaign finance law "does not limit the amount of money that a person, business, or PAC may contribute directly to a candidate's campaign."  *Id.* at 1060.  Because Alabama did not limit candidate contributions, the state had an important interest in preventing quid pro quo corruption that could arise from contributions to the plaintiff PAC.  *Id.* at 1070.

Here, Defendants assert an interest in preventing corruption or the appearance thereof, and preventing evasion of contribution limits, but the Court is not persuaded Section 23.3(12) is closely drawn to achieve these goals.  Under Missouri law, a "political action committee" is an independent actor.  *See* § 23.7(20) (defining a PAC as "a committee of continuing existence *which is not formed, controlled or directed by a*

---

[24] A "multicandidate political committee" is one that, relevant to this matter, "has received contributions from more than 50 persons, and...has made contributions to 5 or more candidates for Federal Office."  *Cal. Med.*, 453 U.S. at 185 n.1.  The Court considers a "multicandidate political committee" to be similar to AMEC-PAC in that AMEC-PAC wishes to contribute to candidates.

*candidate*, and is a committee other than a candidate committee, political party committee, campaign committee, exploratory committee, or debt service committee, whose primary or incidental purpose is to receive contributions or make expenditures to influence or attempt to influence the action of voters...." (emphasis added)).  Given this status as an independent actor, the Supreme Court's guidance in *McCutcheon* once again applies, leading the Court to conclude Defendants do not have a valid interest in preventing corruption or the appearance thereof by regulating PAC to PAC transfers by imposing an absolute ban as Section 23.3(12) does.  *See McCutcheon*, 134 S. Ct. at 1452 (stating "there is not the same risk of *quid pro quo* corruption or its appearance when money flows through independent actors to a candidate, as when a donor contributes to a candidate directly.  When an individual contributes to a candidate, a party committee, or a PAC, the individual must by law cede control over the funds.").

Defendants also cite an important interest in preventing evasion or circumvention of Section 23's contribution limits as a reason to uphold the PAC to PAC contribution ban.  The Supreme Court and many circuits have found this is a valid interest.  *See, e.g.*, *Cal. Med.*, 453 U.S. at 197-98; *N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 292 (4th Cir. 2008); *Catholic Leadership Coal. of Tx. v. Reisman*, 764 F.3d 409, 444 (5th Cir. 2014).  However, AMEC-PAC and other Plaintiffs have not asserted a PAC is not subject to Section 23.3(1)(a)'s $2,600 contribution limit.  In fact, AMEC Plaintiffs specifically state they are subject to these limits.  *See* Doc. #34, at 3-4 (stating "Plaintiffs are not challenging the $2,600 limit on contributions from PACs to candidates found in Article VIII, Section 23" and "[i]n Missouri, PACs make both candidate contributions (subject to the $2,600 limit) and independent expenditures.").[25]

Finally, the Court notes the absolute prohibition, as opposed to a limit, imposed by Section 23.3(12).  "In determining whether a contribution limit is 'closely drawn,' the Supreme Court has suggested that 'the amount, or level, of that limit could make a difference.'"  *Ala. Democratic Conference*, 838 F.3d at 1069 (quoting *Randall v. Sorrell*,

---

[25] The Court agrees with AMEC Plaintiffs' reading of Section 23.  A "person" is subject to the $2,600 contribution limit.  § 23.3(1)(a).  A "committee" is included in the definition of a "person."  § 23.7(19).  The term "committee" includes a "continuing committee."  § 23.7(6).  A "continuing committee" is the same as a "political action committee."  Advisory Opinion No. 2017.02.CF.003.

548 U.S. 230, 247 (2006)). As the Court has repeatedly noted, Section 23.3(12) imposes an absolute prohibition on PAC to PAC contributions. The Court has found no similar statute or state constitutional amendment. While evasion of campaign finance limits is an important interest, Section 23.3(12)'s absolute prohibition on PAC to PAC transfers is not closely drawn to serve this interest when Section 23's contribution limits apply to PAC contributions to candidates and their committees. Moreover, Defendants do not have an interest in preventing corruption or the appearance thereof in PAC to PAC contributions among entities that are, by law, independent actors. Accordingly, the Court finds Section 23.3(12)'s ban on PAC to PAC contributions is unconstitutional. The Court will enjoin enforcement of Section 23.3(12)'s ban on PAC to PAC contributions.[26]

### (4) Remaining *Dataphase* Factors

Although probability of success is the most significant factor, the Court must address the remaining *Dataphase* factors. These factors are: (1) a "threat of irreparable harm to the movant"; (2) "the state of balance between this harm" and any injury that granting the injunction will cause to others; and (3) "the public interest." *Dataphase*, 640 F.2d at 114. If a plaintiff shows a violation of a constitutional right, the other requirements for injunctive relief are generally satisfied. *See MCCL*, 692 F.3d at 870.

Because the Court determined Plaintiffs established a violation of their constitutional rights, the other requirements for injunctive relief are generally satisfied. *See MCCL*, 692 F.3d at 870. The Court will briefly review these requirements. A loss of First Amendment rights poses a threat of irreparable harm to Plaintiffs. *See Elrod v. Burns*, 427 U.S. 347, 373 (1973) (holding "[t]he loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury."). Plaintiffs also seek a quick resolution of this matter so they may participate in ongoing legislative sessions and begin raising funds with which they will participate in upcoming elections. Furthermore, the Court finds granting a permanent injunction in this matter

---

[26] During this course of litigating this matter, Defendants questioned whether FFEF was a true independent expenditure only PAC. The Court finds Section 23.3(12) is facially unconstitutional, and unconstitutional as-applied to FFEF. Therefore, the Court does not address argument regarding FFEF's independence.

strikes a balance between the harms Plaintiffs face, and the harm granting this permanent injunction will cause to others.  The Court recognizes Section 23 was passed by an overwhelming majority of Missouri voters.  However, the Court but must balance the public's vote for campaign finance reforms with Plaintiffs' rights to engage in constitutionally protected conduct.  The Court does not find Section 23 unconstitutional in full, but rather will enter a permanent injunction severing unconstitutional portions of Section 23, while upholding many provisions consistent with the MEC's advisory opinions.  Finally, the public interest is in favor of protecting First Amendment freedoms.  *See Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008) (stating "it is always in the public interest to protect constitutional rights.").  For these reasons, the Court finds the remaining *Dataphase* factors weigh in favor of granting Plaintiffs' motions for permanent injunctive relief.

### III.  CONCLUSION

The Court grants Defendants' first motion to dismiss (Doc. #28).  AMEC Plaintiffs' claims against the State of Missouri are dismissed, and their state-law claims are dismissed without prejudice.  The Court denies Defendants' second motion to dismiss (Doc. #30).  The Court dismisses Count II of FFEF Plaintiffs' Complaint, pursuant to FFEF Plaintiffs' representation that they are abandoning this claim.

The Court partially grants Plaintiffs' motions for permanent injunction.  Case No. 17-4006, Doc. #14; Case No. 14-4332, Doc. #18.  In granting Plaintiffs' motions, the Court does not enjoin enforcement of Section 23 in its entirety.  The Court finds unconstitutional portions of Section 23 are severable consistent with Section 23's severability provision.  *See* § 23.8.

It is therefore Ordered:[27]

      1.  The Court permanently enjoins Defendants[28] from enforcing Article VIII, Sections 23.3(3) and 23.3(16)(c) of the Missouri Constitution against a

---

[27] In proscribing injunctive relief, the Court uses terms as defined in Article VIII, Section 23 of the Missouri Constitution.

[28] "Defendants" include the Missouri Ethics Commission, James Klahr in his official capacity as Executive Director of the Missouri Ethics Commission, Commissioners Nancy Hagan, and Vice Chairs Bill Deeken, Eric L. Dirks, Don Summers, Kim Benjamin,

corporation or labor organization for making a contribution to a campaign committee that only supports or opposes ballot measures.

2. The Court permanently enjoins Defendants from enforcing Article VIII, Section 23.3(1)(a) of the Missouri Constitution against a person whose contribution to elect a single individual to office in a single election does not exceed $2,600 per election, allowing for an adjustment of the contribution limit as described in Section 23.3(18).

3. The Court permanently enjoins Defendants from enforcing Article VIII, Section 23.3(1)(a) of the Missouri Constitution against a person who contributes to a continuing committee or political action committee unless the contribution is restricted or designated for a specific candidate as Missouri Ethics Commission Advisory Opinion No. 2017.02.CF.003 provides.

4. The Court permanently enjoins Defendants from enforcing Article VIII, Section 23.3(16)(c) of the Missouri Constitution against a foreign corporation that does not have the authority to transact business in Missouri pursuant to chapters 347 through 360 of the Missouri Revised Statutes. This is consistent with Missouri Ethics Commission Advisory Opinion No. 2017.02.CF.006.

5. The Court permanently enjoins Defendants from enforcing Article VIII, Section 23.3(12) of the Missouri Constitution's prohibition against political action committees receiving contributions from entities formed outside of chapters 347 through 360 of the Missouri Revised Statutes.

6. The Court permanently enjoins Defendants from enforcing Article VIII, Section 23.3(12) of the Missouri Constitution's prohibition on political action committees receiving contributions from other political action committees.

At the hearing, Defendants requested this Court stay any injunctive relief ordered to allow Defendants the opportunity to appeal this Court's decision. The Court grants

_____

and George Ratermann, and including successors, current and future officers, agents, servants, employees, and all other persons in active concert of participation with them.

this request.  The Court stays enforcement of this Order for a period of forty-five days after entry of this Order.

IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, SENIOR JUDGE
DATE: May 5, 2017          UNITED STATES DISTRICT COURT